## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

TODD LOPEZ, as Personal Representative
of the Estate of MICHAEL PONCE,
MELISSA DOMINGUEZ, as Next Friend to
IZAIAH PONCE, a minor, and individually, PAULINE
PONCE, as Next Friend to ANGELINA PONCE, a minor and
individually, JOE PONCE, individually,

       Plaintiffs,

and                                       No. 1:19-cv-00349-JCH-LF

LEE HUNT, as Personal Representative of the Estate of
FERNANDO M. GARCIA, ROSA V. GARCIA, EMILIO
GARCIA VEGA, MARIA ELIZABETH GARCIA VEGA,
REYNALDO GARCIA VEGA, MARTHA ZULEMA GARCIA
VEGA and JUAN JOSE GARCIA VEGA,

       Intervenor-Plaintiffs,

v.

WESTERN SURPLUS LINES AGENCY, INC.,
REDPOINT COUNTY MUTUAL INSURANCE
COMPANY, and RAMON FABELO,

       Defendants.

## MEMORANDUM OPINION AND ORDER

       This is a dispute over insurance coverage for a wrongful death lawsuit arising from a fatal

crash between a pick-up truck and a tractor-trailer. The decedents' estates and their family

members (Plaintiffs and Intervenor-Plaintiffs, collectively referred to as "Plaintiffs") sued the

tractor's named insured, Ramon Fabelo. Fabelo's insurer, Redpoint County Mutual Insurance

Company ("Redpoint"), denied coverage after determining that Fabelo was leasing the tractor to

a lessee who was using it for its own commercial use. After considering the parties' cross-

motions for summary judgment (ECF Nos. 53, 55), the Court concludes that Redpoint's motion will be **GRANTED** and Plaintiffs' motion will be **DENIED**.

## I.       FACTUAL BACKGROUND

On February 18, 2018, Leonardo Ferras was driving an unloaded tractor-trailer in southern New Mexico on his way to pick up sand. Def.'s UMF ¶ A, ECF No. 53; Pls.' AUMF ¶ 1, ECF No. 63. Ferras was employed by Oil Field Outfitters, LLC (Outfitters). *Id*. ¶ 16. Ferras crossed into the wrong lane of traffic on Highway 285 near Loving, crashing head-on with a vehicle driven by Michael Ponce. First Am. Compl. ¶¶ 16, 18, 20, ECF No. 37. Ponce and his passenger Fernando Garcia were killed. *Id*. ¶ 21.

The owner of the tractor (a 2004 Freightliner) was Texas resident Ramon Fabelo, an independent contractor. Pls.' UMF ¶¶ 2, 4, ECF No. 56. Redpoint was Fabelo's insurer. *Id*. ¶ 6. Redpoint is organized under Texas laws and based in Texas. Notice of Removal, ¶ 14, ECF No. 1. Redpoint issued Fabelo a combined liability policy with $1 million limits per accident for the period of December 1, 2017 – December 1, 2018. Def.'s UMF ¶ B; Pls.' AUMF ¶ 4. The policy's declarations page was titled "Texas Business Auto Coverage Form Declarations" and listed Fabelo as the named insured and Fabelo's Midland, Texas mailing address. Def.'s Ex. C, ECF No. 59-3, 7 (Policy).

The policy stated that Redpoint would "pay all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto." Pls.' AUMF ¶ 7. An endorsement to the policy, titled "Truckers – Insurance for Non-Trucking Use," on Form TE23 09 changed liability coverage for a covered auto. Policy at 35. Because the parties

2

dispute not only the proper interpretation of the exclusions in the endorsement, but also their appearance, the Court displays the exclusions as Ramon Fabelo would have encountered them.

**TRUCKERS - INSURANCE FOR NON-TRUCKING USE**

This endorsement modifies insurance provided under the following:

> BUSINESS AUTO COVERAGE FORM
> GARAGE COVERAGE FORM

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

| Endorsement Effective | Policy Number |
|---|---|
| 12/01/2017 | WRPB1710392 |
| Named Insured<br>RAMON FABELO | Countersigned by *Fral Tale*<br>(Authorized Representative) |

**SCHEDULE**

Description of covered auto:

LIABILITY COVERAGE for a covered auto described in the Schedule or in the Declarations is changed as follows:

1. The following exclusions are added:

   This insurance does not apply to:

   a. A covered auto while used to carry property in any business.

   b. A covered auto while used in the business of anyone to whom the auto is rented.

2. WHO IS AN INSURED does not include anyone engaged in the business of transporting property by auto for hire who is liable for your conduct.

*Id.*

The parties refer to provisions 1(a) and (b) as "bobtail exclusions." "'Bob-tail' in trucking parlance is the operation of a tractor without an attached trailer," and "bobtail insurance" typically refers to insurance for when a tractor is not being used in the business of an authorized carrier. *Prestige Casualty Co. v. Michigan Mutual Insurance Co.,* 99 F.3d 1340 (6th Cir. 1996); *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 932 (7th Cir. 2011) (defining "bobtail insurance" as coverage for "truck drivers while they are … driving their cabs without trailers

outside the service of the federally licensed carriers under whose authority they operate.") Bobtail exclusions, according to Redpoint, "preclude coverage when a tractor is in the use to further commercial interests of a party to whom the truck is being leased."[1] Def.'s Mot. at 16.

At the time of the crash Ramon Fabelo was leasing the tractor to Oil Field Outfitters. Def.'s UMF ¶ H. Outfitters is a motor contract carrier of property authorized to provide transportation of property under contract with shippers and receivers of general commodities. Def.'s Ex. D, ECF No. 57-4, 1 (Lease). "Federal regulations governing motor carriers require carriers to either own their trucking equipment or to enter into written leases in which the 'owner' of the equipment 'grants the use of equipment, with or without driver, for a specified period ... for use in the regulated transportation of property, in exchange for compensation." *Medina*, 645 F.3d at 931 (citation omitted).

Fabelo and Outfitter's signed December 3, 2017 lease provided that Outfitters had "exclusive possession, control, and use of the equipment," and stipulated that Outfitters "assume[d] complete responsibility for the operation of the equipment for the duration of the lease." Def.'s UMF ¶¶ E, F, H; Lease at 3. The lease stated that Fabelo "agree[d] to properly identify equipment with" Outfitters' name and Federal Highway Administration's MC number. *Id*. at 2. The lease also stipulated that Outfitters would "maintain liability and cargo insurance coverage for the protection of the public," under federal highway requirements. Def.'s UMF ¶ G. Outfitters maintained a commercial general liability policy on the leased tractor with coverage in the amount of $2 million general aggregate and $ 1 million per occurrence. *Id*. ¶ I.

---

[1]     As courts have explained, "[a]lthough insurance with a nontrucking use endorsement is often referred to as 'bobtail insurance,'" the coverage may not be strictly described in terms of "bobtailing." *Mahaffey v. Gen. Sec. Ins. Co.*, 543 F.3d 738, 740 (5th Cir. 2008) (analyzing an exclusion identical to the case at bar which stated that: "the insurance does not apply to ... [a] covered 'auto' while used to carry property in any business ... [or] a covered 'auto' while used in the business of anyone to whom the 'auto' is rented.")

Concerning the driver, Leonardo Ferras, the parties agree that he "was operating the truck with permission from and solely under Outfitters, and he was driving under Department of Transportation (DOT) operating authority of Outfitters." *Id*. ¶ K. They further agree that Ferras was "not attending to personal matters" when the crash occurred. *Id*. ¶ J. Rather, he was driving the tractor "solely" under Outfitters' authority and was on his way to pick up a load and awaiting further instructions from either Outfitters or Shield Transport, LLC (Shield), a company with whom Outfitters had a "service agreement." *Id*. ¶¶ J, K, L; Pls.' AUMF ¶ 17.

Outfitters' owner Pedro Sotelo stated at a later deposition that Outfitters does not own its trucks. Deposition of Pedro Sotelo, 66:22-23, ECF No. 63-1 (Sotelo Depo.) When asked about Outfitters and Shield's business arrangement, Sotelo stated that the two companies operated as a joint venture and that most of Outfitters' sand division trucks, including the one involved in the accident, were "dedicated" to Shield. *Id*. 61:9-20; 65:6, 20-22, ECF No. 64-1. Because Outfitters lacked MSAs – a term undefined by the parties – if Outfitters "wanted to haul … sand," it "needed to do it through Shield's MSA[.]" *Id*. 62:17-19. Ramon Fabelo and Outfitter's lease stated that Fabelo was "aware [he] will be operating solely under [Outfitters] dedicated to Shield …." Lease at 5. Shield is never otherwise mentioned as party to the lease and the lease does not define the term "dedicated."

The parties dispute whether Ferras, the driver, was "leased to Shield," as Plaintiffs claim. Although not specifically cited by either party, Outfitters could neither admit or deny that Ferras "was acting in the course and scope of his employment with [Outfitters]," because it was "unclear" to Outfitters "who employed Mr. Ferras." Def.'s Ex. G., 3. As evidence that Ferras was leased to Shield, Plaintiffs cite Redpoint's claim investigation in which the investigator, summarizing his review of documents, wrote that: "In the … loss notice, the notice states 'I

[Ferras] am leased to Shield Transport and was working at the time." ECF No. 25-6. The next immediate sentence, which neither party cites to, states that, "With regard to 'relation to the insured' Mr. Ferras is described as 'employee.'" *Id*. Plaintiffs also cite Pedro Sotelo's deposition statements which they perceive to be inconsistent. Sotelo testified that Outfitters employed Ferras. Sotelo Depo. 113:4-6. As Plaintiff correctly point out, he also testified that Ramon Fabelo "hired" Ferras to drive the tractor and that Fabelo gave him a road test. *Id*. 151:19; 137:8. When asked if Ferras drove tractors besides Fabelo's, Sotelo answered, "As far as my knowledge, that's the only truck he drove." *Id*. 152:2-3. Concerning payment of wages, Sotelo deposed that Outfitters did not pay drivers, saying "that would come through Shield." *Id*. at 190:20-24. When asked about how Ferras received his wages, Sotelo answered that "[Ferras's payment] came from Shield … to Ramon, and then Ramon paid Ferras." *Id*. 191:1-8.

Redpoint claims there is no dispute of fact that Outfitters hired Ferras. It points to Outfitters' admission in discovery that Ferras "had the permission of [Outfitters]" to operate the tractor and other similar admissions. Def.'s Ex. G. at 3. Redpoint also relies on an exchange during Sotelo's deposition when Sotelo was asked how Ferras came to apply for a job. Sotelo responded that he did not know Ferras beforehand and answered that:

> Sotelo:      Ramon Fabelo … brought him to me. Ramon Fabelo was driving his truck that was leased on to me. I offered him a job as a dispatcher to help dispatch. And he got – he said give me time to get a driver. So he got a driver for his truck. That's who brought him.
>
> Counsel:     And then [Outfitters] hired Ferras –
>
> Sotelo:      Yes.

| Counsel: | -- to drive Fabelo's truck? |
| Sotelo: | Yes. |
| Counsel: | So Fabelo could be a dispatcher? |
| Sotelo: | Yes. |

Sotelo Depo. 67:6-17.

Although not discussed or cited by either party, Fabelo and Outfitters' lease for the Freightliner specifically disclaimed an "employee-employer" relationship and stated that Fabelo was responsible for any drivers or employees. The lease provision stated in its entirety that:

> It is agreed that the services of LESSOR [Fabelo] under the terms of this agreement is that of an independent contractor and that no 'employee-employer' relationship exists between LESSOR and LESSEE [Outfitters]. LESSOR is therefore responsible for providing his own workmen's compensation insurance, employment and income taxes, etc. Further, any drivers or employees of LESSOR are the complete responsibility of LESSOR.

Lease at 3. In an independent contractor declaration attached to lease, Fabelo signed a provision stating: "I regularly seek out work with companies and am not an employee of any company." *Id.* at 6. Sotelo also testified that the tractor was "an owner/operator truck leased onto me [Outfitters]" and stated that Fabelo "could have work[ed] for somebody else if he pleased." Sotelo Depo. 66:4, 11-12.

In addition to Ferras' employment status, Plaintiffs also contend that a factual controversy exists because the tractor, although operated "through" Outfitters, "was doing work for Shield." Pls.' AUMF ¶ 15. As support, Plaintiffs cite Pedro Sotelo's deposition about "dedicating" the sand-hauling portion of his leased fleet to Shield and Sotelo's statement in discovery that he was uncertain about whose sand Ferras was on the way to retrieve. He stated that "[b]ased on information and belief" Ferras "may have been on his way to be loaded by a business entity that used the letters or acronym 'CIG' …." Pls.' Ex. 1, ECF No. 58-1, 6.

## II.      PROCEDURAL BACKGROUND

Shortly after the 2018 accident, Ponce's estate filed a wrongful death lawsuit against Ferras, Outfitters and others, in New Mexico state court. Outfitters removed the action based on the parties' diverse citizenship under 28 U.S.C. § 1332. Notice of Removal, *Lopez et al. v. Oil Field Outfitters, LLC*, 1:18-cv-00351-NF-KHR (D.N.M Apr. 16, 2018), ECF No. 1, 2. After Garcia's estate and his family members joined the wrongful death lawsuit, they asserted various torts against Fabelo as the owner of the tractor trailer. Pls.' UMF ¶ 3. The personal representative of Ponce's estate and Ponce's family members are New Mexico residents.

Redpoint defended its insured, Ramon Fabelo, subject to reservation of rights. *Id.* ¶ 6. Def.'s Mot. at 16. But, quoting directly from the bobtail exclusions, it told him that coverage may be unavailable for "damages arising out of the claim to the extent the Tractor involved in the accident is a scheduled 'auto' under the policy, Mr. Ferris [sic] was using the Tractor with your permission, and the Tractor was being 'used to carry property in any business,' or was 'used in the business of anyone to whom the auto is rented' at the time of the accident." Pls.' UMF ¶ 6.

So in February 2019 Ponce's estate and family members filed another lawsuit in New Mexico state court seeking a declaration that the insurance coverage was available to satisfy claims in the wrongful death lawsuit and asserted state common-law and statutory claims. Notice of Removal, Ex. A, ECF No. 1-1. Redpoint and another insurer removed the complaint based on diversity jurisdiction. *Id.* ECF No. 1.

The parties eventually settled the wrongful death lawsuit and the district judge dismissed all claims. Joint Mot. to Dismiss, *Lopez*, No. 1:18-cv-00351-NF-KHR, ECF Nos. 127, 128; Pls.' Mot. ECF No. 56 at 2. As part of their settlement, however, the parties agreed that Ramon Fabelo "was liable to Plaintiffs" and that the purpose of this lawsuit would be to litigate the availability

of "coverage for … the claims brought against [Fabelo] in the Wrongful Death Lawsuit under the Redpoint" Policy. *Id.*

Plaintiffs' first amended complaint brings two claims for relief – Count 1 and Count 2. In Count 1, Plaintiffs cite New Mexico's Declaratory Judgment Act, NMSA 1978 § 44–6–1 to –15 and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. They ask the Court to declare that "there is coverage for the claims made by the Lopez Plaintiffs and Intervenors under the Defendant Redpoint County Mutual Insurance combined liability policy limit of $1,000,000 per accident, policy number WRPB1710392, with Ramon Fabelo named as the insured" and to "establish the rights, status, and liabilities of the parties." First Am. Comp. ¶¶ 26-27. "Specifically," they ask the Court to declare that: (a) "any denials made by [Redpoint] as to the coverage render the insurance policy … illusory," (b) "the denials of coverage made by [Redpoint] [are] contrary to New Mexico public policy and prohibited," and that (c) the Policy "provides coverage for Ramon Fabelo for the February 18, 2018 accident." *Id.* ¶¶ 28-30.

In Count 2, Plaintiffs plead a claim for breach of contract. They allege that a contract for insurance existed between Fabelo and Redpoint, *id.* ¶ 32, and that under New Mexico and federal law, Fabelo was required to carry liability insurance "for the protection of the motoring public." *Id.* ¶¶ 33-34. They further allege that "[t]he parties to the insurance contract … intended, and specifically contemplated, that the motoring public would be the beneficiary to the insurance contract." *Id.* ¶ 38. Redpoint "breached its promise and contractual duties," they say, by "refus[ing] to provide the $1,000,000 liability coverage for Fabelo related to the February 18, 2018 accident." *Id.* ¶ 37. They allege that Redpoint has directly and proximately caused their injuries, *id.* ¶ 39, and that Redpoint is liable "for $1,000,000 in coverage and [Redpoint's] refusal

to pay that amount is a breach of the contract and a breach of the covenant of good faith and fair dealing owed by Redpoint to Ramon Fabelo." *Id.* ¶ 40.

## III.    STANDARD OF REVIEW

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it can have an impact on the outcome of the lawsuit and genuine if a rational jury could find in favor of the non-moving party based on the evidence presented." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).

If the moving party bears the burden of proof on its claims at trial, it must first affirmatively show that, on all the essential elements of his claims, no reasonable jury could find for the nonmovant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J. dissenting). "Summary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* The district court's role in analyzing a motion for summary judgment is to simply "assess whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005).

In analyzing cross-motions for summary judgment, a court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

## IV.    DISCUSSION

### 1. Governing Law

Plaintiffs and Redpoint agree that in this diversity action, the Court is to apply New Mexico choice-of-law rules. *See Tucker v. R.A. Hanson Co., Inc.*, 956 F.2d 215, 217 (10th Cir. 1992) ("When deciding diversity cases, federal courts apply the law of the state in which they are sitting .... This includes applying the state choice of law rules.") The first step in a New Mexico choice-of-law analysis is to characterize the claim by "area of substantive law—e.g., torts, contracts, domestic relations—to which the law of the forum assigns a particular claim or issue." *Terrazas v. Garland & Loman, Inc.*, 2006-NMCA-111, ¶ 11, 142 P.3d 374, 377. New Mexico courts, "in determining the appropriate law to apply when an accident occurs in one state and an insurance contract has been entered in another, [apply] the law of the place of the accident … to determine the plaintiff's right to recover from the negligent party, and the law of the place of the contract, the *lex loci contractus,* … to interpret the terms of the contract." *Wilkeson v. State Farm Mut. Auto. Ins. Co.*, 2014-NMCA-077, ¶ 5, 329 P.3d 749, 750. "[T]he policy of New Mexico is

to interpret insurance contracts according to the law of the place where the contract was executed." *Shope v. State Farm Ins. Co.*, 1996-NMSC-052, ¶ 9, 925 P.2d 515, 517.

The policy was executed in Texas. It lists Fabelo's Midland, Texas address and Plaintiffs acknowledge that Fabelo purchased the policy in Texas. *See id.* ¶¶ 3, 9 (Virginia law governed an auto insurance contract that was purchased in Virginia); *Wilkeson*, 2014-NMCA-077, ¶ 5 ("California law would govern as to issues pertaining to the insurance policies," because the "policies were issued to Plaintiff while she resided in California, and the policy covering the car in the accident, the only policy of record, lists her California address"). Accordingly, Texas substantive contract law applies to issues involving contract interpretation of the policy.

In a diversity action, the court "must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018). Under Texas law, "[a]n insurance policy is a contract, generally governed by the same rules of construction as all other contracts." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). A court's "fundamental objective is to effectuate the parties['] intent as expressed by the words chosen to memorialize their agreement or, in the case of a state-promulgated form, to ensure contract terms are construed according to the ordinary, everyday meaning of the words to the general public." *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019).

A court interpreting an insurance policy must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257–58 (Tex. 2017). "Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *RSUI*, 466 S.W.3d at 118.

"When an insurance policy defines its terms, those definitions control." *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 381 (Tex. 2012). If a policy does not define a term, then the court gives "the term its common, ordinary meaning, while reading the term in context and in light of the rules of grammar and common usage." *Anadarko Petroleum Corp. v. Houston Cas. Co.*, 573 S.W.3d 187, 192 (Tex. 2019).

"A contract is unambiguous if it can be given a definite or certain legal meaning." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). On the other hand, "a contract is ambiguous only if, after applying the rules of construction, it remains subject to two or more reasonable interpretations." *RSUI*, 466 S.W.3d at 119. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, … and admit extraneous evidence to determine the true meaning of the instrument. *Id*.

### 2. The Endorsement's Title, Appearance and Context

Plaintiffs first argue that the endorsement's title "is misleading when viewed as a part of the whole policy" because the title suggests that it provides "insurance for non-truck use" and "coverage[ ] in addition to the coverage otherwise provided in the policy." Pls.' Mot. at 8. They state that someone in Fabelo's position would reasonably expect "that if he were sued as an owner of a tractor involved in an accident, he would have liability coverage," because "liability coverage is designed to protect an insured from liability he may incur to third parties who are injured in an auto accident." *Id*. at 11. Plaintiffs state that the policy "provides broad coverage

for bodily injury damages," and they contrast it to a stand-alone bobtail policy which may provide coverage for a narrower type of liability.

However, Plaintiffs submitted no summary judgment evidence from, *e.g.*, Fabelo about his expectations when he purchased the insurance or, say, an affidavit from an insurance expert describing the policy that could potentially create a fact question. All the Court has before it is the policy itself and Plaintiffs' summary judgment briefing states that the parties' dispute "rests not on disputed facts but on a legal question regarding coverage." Pls. Mot at 7. Turning to the policy, it states throughout that it provides the insured "Business Auto Coverage." As in *Mahaffey*, where the lessor's insurer issued it an insurance policy on a truck that, like here "included liability, personal-injury, uninsured-motorist, and collision coverage." 543 F.3d at 740. Additionally, as here, "[t]he coverage was subject to exclusions and endorsements, including a nontrucking use endorsement" providing that "the insurance does not apply to ... [a] covered 'auto' while used to carry property in any business ... [or] a covered 'auto' while used in the business of anyone to whom the 'auto' is rented." *Id.*

The exclusion at issue was entitled "Truckers – Insurance for Non-Trucking Use," Policy at 35, which "typically describes bob-tail … insurance and thus provides coverage only when the [listed] tractor is being used without a trailer or with an empty trailer, and is not being operated in the business of an authorized carrier." *Meade ex rel. Meade v. Great Am. Assur. Co*., 198 F. App'x 475, 478 (6th Cir. 2006) (per curiam). Here, Redpoint does not dispute that "[b]obtail insurance covers drivers when they are driving their trucks but not on dispatch from a carrier, and broadly encompasses the 'non-trucking use' of a vehicle." Def.'s Mot. at 16 (quoting *Owner-Operator Indep. Drivers Ass'n, Inc. v. United Van Lines, LLC*, No. 4:06 CV 219 JCH, 2006 WL 1877081, at *4 n.4 (E.D. Mo. July 6, 2006)). Rather, it only argues that it is not

obligated to pay that coverage because of the provision excluding coverage for a "covered auto while used in the business of anyone to whom the auto is rented."

Reading together the business auto policy and the business use exclusion contained within the endorsement, the only reasonable interpretation is that the endorsement excludes coverage from the insured business auto policy when a covered auto is being operated on behalf of a commercial lessee. Plaintiffs' claim that the endorsement's title is misleading – without any summary judgment evidence from Fabelo describing his expectations when he obtained the policy or an industry expert's contextual evidence – is not a reasonable interpretation and the Court will not adopt Plaintiffs' construction.

Plaintiffs next argue that the endorsement "communicates that the exclusions … are not applicable because no covered auto is described in the Schedule or in the Declarations" and the section after "Description of a covered auto" is left blank. Pls.' Mot. at 9. Although Plaintiffs are correct about the latter point, other portions of the policy do indeed define a "covered auto." "Section I – Covered Autos" begins "Item Two of the Declarations shows the autos that are covered autos" and gives a key for nine differed categories of "covered autos." Policy at 9. Fabelo's truck was assigned number "7," which meant it was an auto specifically described in a "Schedule of Covered Autos" on the declarations page. *Id*. at 7, 9. The schedule refers to page "TE 99 74B." *Id.* at 7. That page in turn lists a "2004 Freightliner Tract[or]" as the only "covered auto" and refers to Fabelo as the named insured. *Id*. at 7, 24. The endorsement therefore cannot be read to mean that "the exclusions contained therein are not applicable because no covered auto is described in the Schedule or in the Declarations," Pls.' Mot. at 9, because Plaintiffs' construction is inconsistent with other written portions of the policy and the Court will not attribute this meaning to the endorsement.

In summary, after considering the endorsement and its title in context with all of the policy's provisions, the Court concludes that the endorsement cannot be read to support Plaintiffs' proposed construction. The Court next focuses on the application of the specific exclusion at issue.

### 3. Provision 1(b) – "In the Business of"

Provision 1(b) excludes insurance coverage for a "covered auto while used in the business of anyone to whom the auto is rented." In *Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc.*, 220 F.3d 679, 682 (5th Cir. 2000), perhaps the most authoritative case on the exclusion at issue, the Fifth Circuit held that under Texas law the phrase "in the business of" is unambiguous and that the exclusion at issue here "clearly refers to occasions when the truck is being used to further the commercial interests of the lessee." This is called the "commercial interest" test. *Mahaffey*, 543 F.3d at 743.[2] This test is used to distinguish scenarios where a tractor, although leased, is "used for the lessor's personal purposes" from scenarios where the tractor is used in the lessee's business purposes. *MGM Transp. Corp. v. Cain*, 128 N.C. App. 428, 430, 496 S.E.2d 822, 824 (1998). In the former scenario, the lessor's bobtail policy would provide liability coverage. *Id*.

In *Empire*, a trucking company-lessor's insurance policy excluded coverage, much like here, "while a covered 'auto' is used in the business of anyone to whom the 'auto' is leased or

---

[2]     Other federal appellate courts utilize the same standard. *See Forkwar v. Empire Fire & Marine Ins. Co.*, 487 F. App'x 775, 780 (4th Cir. 2012) ("the question is whether Mahdi's conduct at the time of the accident 'furthered the commercial interest' of J & J.") (unpublished); *Hartford Ins. Co. v. Occidental Fire & Cas. Co.,* 908 F.2d 235, 239 (7th Cir. 1990) ("The phrase 'in the business of an ... organization to whom the automobile is rented' clearly refers to occasions when the truck is being used to further the commercial interests of the lessee.") Neither party explained whether the Texas Supreme Court has adopted the commercial interest test articulated by the Fifth Circuit in *Empire*. Because *Empire* was a diversity case interpreting Texas law, the Court applies the commercial interest test and predicts that the Texas Supreme Court would do the same.

rented." 220 F.3d at 680, 682 n. 3. The company, Brantley, leased its truck and its driver to haul cargo for Blue Flash. *Id*. at 680. While waiting for the cargo at Blue Flash's terminal, the driver decided to service the truck. *Id*. He drove bobtail to have some service work done and then crashed into a driver on his way back to the Blue Flash's facility. *Id*. In the declaratory judgment action that followed, the district court found that the phrase "in the business of" was ambiguous because "either [the driver] was not engaged in Blue Flash's business because he was riding bobtail … or [the driver] was engaged in Blue Flash's business because he was performing work (maintenance), that would ultimately benefit the interests of the" Blue Flash, the lessee. *Id*. at 681.

The Fifth Circuit reversed. It explained that a provision like 1(b) "clearly refers to occasions when the truck is being used to further the commercial interests of the lessee." *Id.* at 682. Although the court did not enumerate specific factors to be used in analyzing the commercial interest test, the court identified the following facts that placed the driver's actions "within Blue Flash's commercial interests": he "was only biding his time while the cargo loaded," he "had the truck maintenanced, and was en route to Blue Flash's yard to pick up the load when the accident occurred" and "[t]he fact that Blue Flash was leasing the truck, [was] evidence that it was being used in pursuit of Blue Flash's business interests." *Id*. Because "in the business of" as used in a non-trucking endorsement may be resolved as a matter of law on a motion for summary judgment, *Mahaffey*, 543 F.3d at 741, the Fifth Circuit held that the exclusionary provision unambiguously excluded coverage and reversed the lower court's judgment. *Id*. at 680.

The Fifth Circuit revisited a similar fact-pattern a few years later in *Mahaffey*. In *Mahaffey*, the lessor of a truck, Farr Auto Sales, leased a truck and provided a driver to First

Coast Intermodal Service to haul First Coast's cargo from Kentucky to Louisiana. 543 F.3d at 739. Farr's primary insurer issued it a policy with an endorsement that contained exclusions identical to the case at bar. *Id*. at 740. When the driver completed the journey and dropped off the load in New Orleans, he called First Coast's dispatcher and was told by the dispatcher to take the night off and call in the morning to see if another load was available. *Id*. The driver drove bobtail to a truck stop where he spent several hours and then on his way to a motel to sleep for the night he was in a car crash. *Id*.

Applying *Empire*'s commercial interest test, the Fifth Circuit held that the lessor's driver "was in the business of" First Coast as a matter of law and reversed the district court's judgment. *Id*; *id*. at 743. The driver "was on standby for further deliveries" per the dispatcher's instruction; although he was "free to go where he pleased … in the sense that First Coast did not direct his activities that evening, [he] would have had to stay within close proximity to New Orleans"; he "would have lost the opportunity to earn return-trip income if he left before ascertaining whether a load would be available, and First Coast would have lost an available driver"; and "driving to a motel … to be adequately rested, when asked to remain in the area to see if a load becomes available, is a work-related function … because commercial drivers are required to have a certain number of rest hours between hauls." *Id.* at 742–43.

With this background in mind, the Court concludes that the tractor was used in the business of Outfitters as a matter of law. It is undisputed that "the tractor operated by Mr. Ferras was leased by Outfitters" and that Outfitters was the named lessee on that lease. The fact that a lease for the tractor existed "is evidence that [the tractor] was being used in pursuit of [Outfitter's] interests." *Empire*, 220 F.3d at 682. Outfitters' business is "to provide transportation of property" as a motor carrier "under contract with shippers and receivers of general

commodities." Lease at 1. The lease incorporated federal regulations requiring Outfitters to take "exclusive possession, control, and use of the equipment," and "assume complete responsibility for the operation of the equipment for the duration of the lease." *Id*. at 3. In addition, "federal law requires interstate motor carriers, but not equipment lessors, to maintain minimum levels of liability insurance." *Great W. Cas. Co. v. Nat'l Cas. Co.*, 807 F.3d 952, 955 n.2 (8th Cir. 2015). Consistent with this division of responsibility, Outfitters maintained a commercial general liability policy, indicating that the tractor was under lease to further Outfitters' interests. *See Horace Mann Ins. Co. v. Acuity*, 447 F. Supp. 3d 594, 599 (E.D. Mich. 2020) (motor carrier's purchase of liability insurance to comply with federal regulations indicated that it was leasing a tractor).

Furthermore, at the time of the crash, Ferras "was on his way to pick up a load and was waiting for further instruction from either" Shield or Outfitters; he was not "attending to personal matters," indicating that the tractor was being used for work-related functions to further Outfitters' interests. Def.'s UMF ¶¶ J, L. *Cf. RLI Ins. Co. v. Great Am. Ins. Co.*, No. CIV.A. 1:05-CV-352, 2006 WL 1207899, at *3 (E.D. Tex. May 3, 2006) (finding that driver was not in the business of the lessee because the driver had delivered the lessee's load and was driving home for the day when the accident occurred). Although Ferras may have been on his way to be loaded by a company using the letters CIG, the operative fact is that the was moving the tractor while under dispatch to pick up cargo. The Court holds that as a matter of law the tractor was being used in the business of Outfitters when the crash occurred.

Plaintiffs' entire argument of why provision 1(b) is inapplicable is as follows:

Ramon Fabelo, as an independent contractor, leased his tractor to Oil Field Outfitters, LLC. Mr. Ferras, on the other hand, was leased to Shield Transport. Ramon Fabelo's tractor, while it was being operated through Oil Field Outfitters (Pedro Sotelo, owner) was doing work for Shield Transport. Oilfield Outfitters

> and Shield Transport were two separate companies and the service agreement was with Shield. Thus, the tractor was not being used in "business of anyone to whom the auto is rented" because Ramon Fabelo leased his tractor to Oil Field Outfitters, LLC, not to Shield Transport.

Pls.' Resp., ECF No. 63, 9-10; *see also* Pls.' Mot. 9-10.

They additionally state that the phrase "to whom the auto is rented" is ambiguous because the phrase:

> appears to refer to the rental of a covered auto by the Named Insured. Ramon Fabelo leased his tractor Oil Field Outfitters. Mr. Ferras was leased to Shield Transport at the time and Ramon Fabelo had no rental agreement with Shield Transport. Oilfield Outfitters and Shield Transport are two separate companies. Shield Transport had the service agreement, not Outfitters. Thus, Mr. Ferras was engaged in the business of Shield Transport, not of Oil Field Outfitters.

Pls.' Resp. at 10; *see also* Pls.' Mot. at 10.

The evidence concerning Ferras' employment status and whether Outfitters or Shield's business interests was advanced is not resolvable by the Court on cross-motions for summary judgment. However, even drawing all reasonable inferences in Plaintiffs' favor, the disputes they identify are immaterial for summary judgment purposes. It is undisputed that Ferras operated the truck solely under Outfitters' authority and was awaiting instructions from either Outfitters or Shield. Ferras allegedly being leased to Shield does not establish that that the tractor was being used in a business of someone other than Outfitters. Concerning the tractor being "dedicated" to Shield, while the Fabelo/Outfitters lease does not say so, federal regulations contemplate subleases. *See* 49 C.F.R. § 376.12(c)(2). The record shows that Outfitters dedicated the tractor to Shield because Outfitters had to act through Shield's MSA to haul sand. Even if the tractor was used simultaneously in the business of two companies, it is possible that Outfitters was nonetheless advancing its own business interests by dedicating the tractor to Shield to haul sand. Finally, Plaintiffs cited no caselaw demonstrating that their version of the facts raises a genuine

20

issue about the commercial interest test. Because Ferras was operating the tractor at the time of the accident for the purpose of furthering Outfitters' commercial interests, provision 1(b) of the endorsement applies and bars coverage.

Plaintiffs additionally argue that provision 1(a) is inapplicable because Ferras was driving "with an unloaded tractor" and therefore "not carrying any property." Pls.' Resp. at 9. Although such an argument would likely be unsuccessful, *see Medina*, 645 F.3d at 934, the Court need not address or decide Plaintiffs' argument that provision 1(a) is inapplicable because it is sufficient that provision 1(b) bars coverage. The endorsement is disjunctive, so proof of any one provision is sufficient to bar coverage.

### 4. Scope of the Endorsement

Plaintiffs' next argument concerns the portion of the insuring clause stating that Redpoint would "pay all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the *ownership, maintenance or use of a covered auto*." Pls.' UMF ¶ 7 (emphasis added). They contend that if the endorsement does apply, it only excludes coverage "in narrow instances related to the use of a covered auto" and not "the ownership or maintenance of the covered auto." Pls.' Mot. at 16. They therefore assert that claims against Fabelo for "negligent hiring, supervising, training, policy development and the like," are not implicated by the endorsement because those claims relate to Fabelo's ownership or maintenance – but not use – of the tractor. *Id*. at 15.

Plaintiffs' reading of the endorsement's scope is unreasonable because the endorsement makes no reference to the "narrow instances" that Plaintiffs identify. Instead, the endorsement states that "Liability Coverage … is changed" and "this insurance does not apply" when, *e.g.*, a covered auto is used in the lessee's business interests. As Redpoint correctly argues, Plaintiffs'

interpretation injects language into the endorsement that is not included, and the Court therefore will not adopt Plaintiffs' construction.

### 5. Fundamental Principles of Justice

A "narrow exception" to the *lex loci contractus* doctrine exists. *Saveraid v. State Farm Ins. Co.*, 597 F. App'x 492, 495 (10th Cir. 2015). New Mexico courts will apply their own law "if applying the law of another state would result in a violation of fundamental principles of justice of New Mexico." *Demir v. Farmers Tx. Cnty. Mut. Ins. Co.*, 2006-NMCA-091, ¶ 8, 140 P.3d 1111, 1114. "[I]n order to overcome the New Mexico policy of interpreting insurance contracts under the law of the place where the contract was executed, 'there must be a countervailing interest that is fundamental and separate from general policies of contract interpretation.'" *Wilkeson*, 2014-NMCA-077, ¶ 11, 329 P.3d 749, 752 (quoting *Shope*, 1996-NMSC-052, ¶ 9, 925 P.2d at 517). "It is said that courts should invoke this public policy exception only in extremely limited circumstances." *Reagan v. McGee Drilling Corp.*, 1997-NMCA-014, ¶ 9, 933 P.2d 867, 869.

Plaintiffs do not argue that Texas and New Mexico have conflicting state policies. Rather, they argue that even if the Court determines that Texas law "precludes coverage for Mr. Fabelo for all claims Plaintiffs filed against him, two fundamental New Mexico public policies require this Court to apply New Mexico law … 1). New Mexico's strong protection for the reasonable expectations of insureds; and 2). New Mexico's strong protection of the innocent victims of auto accidents." Pls.' Resp. at 13. Plaintiffs did not cite, and the Court is unaware of, an opinion from the New Mexico Supreme Court or the New Mexico Court of Appeals holding that the exclusion at issue violates New Mexico's fundamental principles of justice. Thus, because of the diversity nature of this case and its implication of federal-state relations, the Court

must be "reticent to expand state law without clear guidance from [the state's] highest court" when analyzing their arguments. *Amparan*, 882 F.3d at 948.

New Mexico's "doctrine of reasonable expectations applies if the language of an insurance policy would lead the insured to reasonably expect coverage." *Hinkle v. State Farm Fire & Cas. Co.*, 2013-NMCA-084, ¶ 18, 308 P.3d 1009, 1014. "The doctrine is available when the policy language is ambiguous; often, however, 'the dynamics of the insurance transaction, and not the language of the contract itself, determine what the reasonable expectations of the insured are.'" *Aysheh, Inc. v. Maryland Cas. Co.*, No. CIV-04-966 BB/WDS, 2005 WL 8163705, at *3 (D.N.M. Aug. 26, 2005) (quoting *Barth v. Coleman*, 1994-NMSC-067, ¶ 15, 118 N.M. 1, 5, 878 P.2d 319, 323). Plaintiffs state that someone in Fabelo's position would reasonably expect "that if he were sued as an owner of a tractor involved in an accident, he would have liability coverage," because "liability coverage is designed to protect an insured from liability he may incur to third parties who are injured in an auto accident." Pls.' Mot. at 11. However, as explained earlier in this Memorandum Opinion and Order, Plaintiffs tendered no summary judgment evidence about Fabelo's reasonable expectations, and therefore they lack evidence that Fabelo's expectations arise to a fundamental principle of justice.

Plaintiffs also contend that the exclusion would "swallow up the insuring clause – if [Redpoint] is permitted to take away with its left hand what it gave with the right hand." Pls.' Mot. at 14. Plaintiffs cite, but do not provide an analysis of the New Mexico Supreme Court's decisions in *Fed. Ins. Co. v. Century Fed. Sav. & Loan Ass'n*, 1992-NMSC-009, 113 N.M. 162, 824 P.2d 302 and *Ins. Co. of N. Am. v. Wylie Corp.*, 1987-NMSC-011, 105 N.M. 406, 733 P.2d 854). The Court has carefully reviewed these cases and finds them either distinguishable or inapplicable. Distinguishable because there is no direct conflict between the insuring clause and

the exclusion as in *Century*, 1992-NMSC-009, ¶ 15, 824 P.2d at 305. Inapplicable because this case does not involve an erroneous interpretation of a term in a coverage exclusion as in *Wylie*, 1987-NMSC-011, ¶ 27, 733 P.2d at 858.

Plaintiffs' next fundamental-principles-of-justice argument is that the exclusion offends New Mexico's protection of third-party automobile accident victims. They rely on cases from New York courts, likely because "New York courts have deemed non-trucking policies invalid unless they contain a provision making clear that the exclusion of accidents occurring during business applies *only if* some other insurance plan fills in the 'gap in policy coverage for any loss incurred' in the furtherance of business." *United Fin. Cas. Co. v. Country-Wide Ins. Co.*, 779 F. App'x 761, 764 (2d Cir. 2019) (quoting *Royal Indem. Co. v. Providence Washington Ins. Co.*, 92 N.Y.2d 653, 684 N.Y.S.2d 470, 707 N.E.2d 425, 426 (1998)). Plaintiffs also cite a federal district court's opinion, *R.E Turner Inc. v. Conn. Indem. Co.,* 925 F. Supp. 139 (W.D.N.Y. 1996), for the proposition that the "Redpoint Endorsement does not have a provision which limits its application to those instances where other polices of other parties may provide coverage to the victims." Pls.' Mot. at 13.

However, Plaintiffs pointed to no such requirement in the first place that under New Mexico law Redpoint was obligated to condition its exclusion on the availability of other collectible liability insurance. In addition, this is not a case where the enforcing the exclusion "would have left an injured party without recourse to any policy of insurance." *Connecticut Indem. Co. v. Podeszwa*, 392 N.J. Super. 480, 921 A.2d 469 (App. Div. 2007). Federal motor carrier regulations require carriers like Outfitters "to maintain minimum levels of insurance coverage such that the driving public is sufficiently protected from trucking accidents." *Medina*, 645 F.3d at 936. A motor carrier such as Outfitters is obligated to provide liability insurance or

another type of security "sufficient to pay a final judgment against a [carrier] for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles." 49 U.S.C. § 13906(a)(1). "Because of the integrated scheme established by federal law, a truck can never 'drive in and out of coverage,'" because a "bobtail endorsement … must always exist in tandem with the commercial policy required by 49 U.S.C.A § 13906(a)(1)." *Podeszwa*, 921 A.2d at 466. It is undisputed that Outfitters' policy covered damages and that Plaintiffs have recovered such damages from Outfitters' policy. Def.'s Resp., ECF No. 64, 12. Absent any guidance from the New Mexico Supreme Court, the Court will not hold that the exclusion offends New Mexico's protection of car crash victims given that Plaintiffs did in fact collect from Outfitters' insurer.

## V.    CONCLUSION

It is therefore **ORDERED** that because the exclusion in Redpoint's endorsement denying coverage when a covered auto is used to further the commercial interest of a lessee is applicable in this case, Redpoint's summary judgment motion **(ECF No. 53)** is **GRANTED**, Plaintiffs' summary judgment motion **(ECF No. 55)** is **DENIED** and this case is **DISMISSED with prejudice**. A separate final judgment shall issue.

**IT IS SO ORDERED.**

_____
SENIOR UNITED STATES DISTRICT JUDGE